Filed 8/23/23  P. v. Rodriguez CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MIGUEL ANGEL RODRIGUEZ,<br><br>    Defendant and Appellant. | D079931<br><br><br>(Super. Ct. No. SCN390597) |

APPEAL from a judgment of the Superior Court of San Diego County, Sim von Kalinowski, Judge.  Affirmed.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters and Charles C. Ragland, Assistant Attorneys General, A. Natasha Cortina and Melissa Anne Mandel, Deputy Attorneys General for Plaintiff and Respondent.

A jury convicted Miguel Angel Rodriguez of oral copulation/sexual

penetration of a child 10 years old or younger (Pen. Code,[1] § 288.7, subd. (b); counts 1, 3, 5); committing lewd or lascivious acts on a child under age 14 (§ 288, subd. (a); counts 2, 4, 6, 7, 10, 12, 14, 15); and committing forcible lewd acts on a child (§ 288, subd. (b)(1); counts 8, 9).[2] It found true allegations that Rodriguez engaged in substantial sexual conduct (§ 1203.066, subd. (a)(8); counts 1, 2, 3, 4, 5) and there were multiple victims (§ 667.61, subds. (b),(c),(e); counts 2, 4, 6, 7, 8, 9, 10, 12, 13, 14, 15).

The court sentenced Rodriguez to 135 years to life in prison: consecutive 15 years-to-life terms on counts 1, 3, 5, 7, 8, 9, 10, 13 and 14. It imposed concurrent terms on counts 12 and 15, and stayed the sentence on counts 2, 4 and 6 under section 654.

Rodriguez contends: (1) the court prejudicially erred by permitting a psychologist to testify regarding child sexual abuse accommodation syndrome (CSAAS) in violation of Rodriguez's constitutional rights to due process, a fair trial, and confrontation of witnesses; (2) the prosecutor committed misconduct during closing arguments or alternatively his trial counsel provided ineffective assistance by failing to object to the prosecutor's arguments; and (3) the evidence is insufficient to support his convictions on counts 8 and 9. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Rodriguez committed sex offenses against five girls: K.R., A.G., K.M., A.C, and J.G.

---

[1] Undesignated statutory references are to the Penal Code.

[2] The court granted the People's motion to dismiss count 11 in the interest of justice after the jury failed to reach a verdict.

*Prosecution Case*

*Evidence Regarding the J.G. offenses*

The court admitted into evidence and played for the jury a video recording of a January 2018 forensic interview with J.G., who was then 12 years old. J.G. recounted two incidents that occurred when she was around six or eight years old. In the first incident, she was sitting on Rodriguez's lap in his car and watching a video while Rodriguez's family had gone shopping. J.G. said Rodriguez "grabbed my hand and he made me touch his penis. But first he did make me close my eyes."

In the forensic interview, J.G. discussed a second incident that occurred when she was in Rodriguez's work space, saying "he grabbed me from my arm pit and, like, he sat me down." J.G. saw an open tab on Rodriguez's computer, which displayed a video recording of a little girl performing oral sex on an adult. Afterwards, as J.G. was leaving the room, "[Rodriguez] just grabbed my hand [and] made me touch him down there," meaning his penis.

At the time of trial, J.G. was 16 years old and testified in accord with her forensic interview. She testified that she regarded Rodriguez as an uncle, although he is actually married to her maternal grandmother's sister. Growing up, J.G. spent a lot of time with Rodriguez and his family. Once, when she was younger, Rodriguez drove his family and her to a store. While the others left the vehicle, J.G. and Rodriguez stayed in the car. J.G. climbed from the back seat into the front seat and sat on Rodriguez's lap to watch videos on his cellphone. Rodriguez unbuckled his pants, placed J.G.'s hand on his bare penis, put his hand on top of J.G.'s and moved her hand around. She did not try to move her hand, but she asked him what was that. He said it was a sausage and asked her if she liked sausage. The prosecutor asked J.G., "Where was your hand at before Miguel grabbed it and put it in his

3

pants?" She replied that she did not remember. The prosecutor next asked, "Is it fair to say that your hand was outside of his pants?" J.G. replied in the affirmative.

J.G. testified regarding a second incident that occurred possibly the same year outside Rodriguez's house, in a shed he used as a computer room. Once, she was sitting on his lap at the computer, and he started closing tabs on his computer screen. One tab showed a video depicting a "tiny," "little girl" who was licking and sucking on a man's penis. Adults who surrounded her were laughing and making her suck the penis. To J.G., Rodriguez "seemed embarrassed. Like, he seemed scared, right away closing [the tab] and he was like, 'Don't. Don't say anything.' " Rodriguez warned that if J.G. said anything, she would not be allowed to visit his house anymore. Afterwards, while J.G. was on Rodriguez's lap, he grabbed her hand and put it on his penis. He did not move her hand around, and she did not try to move his hand away. He told her not to say anything and they made a "pinky promise" about that.

J.G. testified she never spoke with anyone about these incidents until she was in seventh grade and mentioned it to her school counselor, who called J.G.'s mother. In a meeting with J.G., her mother and the counselor, J.G. initially did not want to identify Rodriguez as the one who had touched her inappropriately because "[i]f there was one person we all looked up to in the family, it was [Rodriguez]." But she eventually disclosed his identity during that meeting.

*Testimony From Other Victims*

K.R. testified Rodriguez was her uncle. On one occasion when she was around five years old, she was sitting on Rodriguez's lap. He took his pants

4

off, pulled out his penis, told her to put her mouth on his penis, and she did so. She did not tell anyone until sometime afterwards.

On another occasion, Rodriguez asked K.R. to go with him to his computer room. Once there, he took off his pants. She testified he "told [her] to do the same thing" as before. His put his penis inside her mouth. K.R. did not remember many of the details of the incidents. The prosecutor asked K.R., "Did you do this to Miguel any other times?" She answered, "Like, a few times," but did not elaborate. K.R. did not tell her family about these incidents immediately because she felt bad about them.

A.G. testified that on one occasion in Rodriguez's computer room, he took his pants off and told her to touch his penis with her tongue. She did so, holding it in her hand. Afterwards, she delayed in telling anybody what happened.

K.M. testified that Rodriguez was a family friend from church. Once, when at Rodriguez's house, she accompanied his daughter to get some clothes from a car. Rodriguez joined them. As K.M. stood outside of the car, Rodriguez stood behind her and pressed his thigh against hers. Her back was against his stomach. He grabbed her arm and forced it inside his pants. She felt his penis, and tried to pull her hand away. But he held it in place by grabbing her wrist, and touched her stomach and breast over her clothes with his other hand. When his daughter got out of the car, Rodriguez pushed K.M. away. At the time, K.M. did not say anything to anyone about this incident.

A couple of months later, K.M. was resting on a top bunk in a bedroom at Rodriguez's house. He entered the bedroom, looked to see if the girls on the bottom bunk were asleep, and then approached K.M. He lifted her shirt and brassiere, exposing her breast. He fondled her breasts and sucked on her

5

nipple. Rodriguez left the room, and K.M. cried. She did not say anything about this incident until a later time.

A.C. testified that once, when she was around six years old, she and four girls were in a room in Rodriguez's house. Rodriguez entered the room and said the girls would get pizza. He then turned off the lights. A.C. continued: "And the next few details are a little fuzzy, but I know he went to go tickle the other girls, which is why I kind of swatted his hand away, since I don't like to be tickled. And then I felt his hand on me, on my thigh, and then he moved up to my vagina. And I froze, and I stopped laughing. And I had my arms close to my chest because I didn't know where he'd be going. And then that happened for a couple of seconds. I'm not too sure how much, though." She delayed in telling her parents about these incidents.

*Other Testimony*

The specialist who conducted the forensic interview with J.G. testified at trial that she is trained in "one of the nationally-recognized forensic interviewing protocols" used in San Diego County, which is called "the Tom Lyon 10-step investigative interview." She described that protocol in detail.

The People also presented expert psychologist Anthony Urquiza, who testified about several myths and misconceptions about child sexual abuse.

*Defense Case*

Defense expert psychologist, Bradley McAuliff, Ph.D., testified he worked with Dr. Tom Lyon, a professor who developed forensic interview protocols. Dr. McAuliff was familiar with Dr. Lyon's national protocol, and knew that it was used in San Diego County.

Rodriguez testified and denied all of the charges, including those involving J.G.

6

At the close of evidence, Rodriguez moved the court to dismiss the charges involving J.G. under section 1118.1, arguing there was insufficient evidence to support the allegations that he used force, violence, duress, menace, or fear of immediate and unlawful bodily injury. The court denied the motion, concluding substantial evidence supported the charges.

DISCUSSION

I. *Dr. Anthony Urquiza's Expert Testimony*

Rodriguez contends the testimony of Dr. Urquiza "was not relevant [as] defense counsel did not seek to show that the victims did not act like other child abuse victims" and the testimony "intruded on the jury's determination of credibility." He argues, "[T]he victims did not recant and the defense did not focus on a delay in disclosure. The defense was that the allegations were not true, the police did a deficient investigation and that confirmation bias occurred." Rodriguez contends, "Even though it did not refer to the victims specifically, the testimony addressed circumstances that were presented in this case, e.g., delayed and incremental disclosure, difficulty in describing the frequency and duration, the child not appearing frightened or traumatized. . . . The inference was that based on these similarities, the victims were telling the truth when making their disclosures."

Rodriguez further contends admission of Dr. Urquiza's testimony "violated [his] constitutional rights to due process, a fair trial, and to confront adverse witnesses." (Capitalization omitted.) He argues he was prejudiced because that testimony "bolstered the victims' credibility, in essence informing jurors that their behavior and circumstances were like other victims of child sexual abuse, the inference being they were credible and [Rodriguez] was guilty. It also conveyed that the jurors' decision should be

7

guided not only on their own evaluation of witness credibility but also on what other, non-testifying experts had found about child abuse victims."

*Motions in Limine*

Rodriguez moved in limine to exclude evidence of CSAAS testimony, arguing it was impermissible scientific evidence under *People v. Kelly* (1976) 17 Cal.3d 24 and *Frye v. U.S.* (1923) 293 F. 1013; and further, it was more prejudicial than probative under Evidence Code section 352.

The People moved in limine to admit Dr. Urquiza's testimony to dispel myths and misconceptions about child molestation and to address the victims' credibility.

At the motion hearing, defense counsel argued Dr. Urquiza's proposed testimony was not relevant: "And I don't actually think in this day and age those are myths. We, especially recently, in the media and in the news, we have seen in the past two years an explosion of cases from people accusing Supreme Court justices to stars, to directors, all of these people have come out and it doesn't seem like America is confused about delayed disclosure. It doesn't seem as though this is an issue where a myth needs to be dispelled." Defense counsel added: "And the only way to combat a he-said/she-said story is to say that's not true and to point out the inconsistencies or the delays or the problematic testimony of the accusers." Defense counsel concluded, "I don't think that the People have proven that the jury is incapable of understanding these things."

The prosecutor responded that Dr. Urquiza's testimony was relevant and a proper topic of expert testimony: "We don't want the jurors to be considering what's going on in the public right now and use that to evaluate the defendant in this case. We have a requirement to prove to the jury, beyond a reasonable doubt, what they need to be applying the facts to the

8

law. In this particular case, Dr. Urquiza is providing that evidence." The prosecutor added: "[P]roviding education to the jury is exactly what we need to do to be able to counter what defense counsel is going to be putting on in their defense. She specifically stated that this is going to be heavily argued on attacking [the victims'] credibility. Well, we shouldn't be stunted in being able to show the jury that these things that the defense attorney is going to be pointing out is actually not an attack on their credibility. Essentially, it's common and it's in line with what victims of this class typically do."

The court ruled Dr. Urquiza's CSAAS testimony was appropriate "as long as [he] doesn't get up and opine as to either the defendant or specific victims." The court granted a portion of the defense's motion prohibiting the expert from "testifying about statistics on false allegations." It agreed to instruct the jury with CALCRIM No. 1193 about the limited use of CSAAS evidence. The court disagreed with Rodriguez's claim the expert's testimony would be prejudicial under Evidence Code section 352, and relied on *People v. Lapenias* (2021) 67 Cal.App.5th 162, 174: "The prejudicial impact of the relatively benign CSAAS testimony was likely to have paled in comparison to the charge[d] conduct." The court ruled the expert's testimony was relevant as it was "outside of the common experience of jurors and more in comparison to the nature of the charges and the evidence that is going to be coming in as to that. It has very little prejudicial effect."

The court allowed defense counsel to raise "in cross-examination that these types of [CSAAS] studies are done on people who are known to be victims. [Counsel] can argue they don't apply to people who are not victims. You can have the expert testify these don't apply to people who aren't victims because they're based on testimony of victims and that leaves open the

9

argument for the jury to determine whether these children were victims or not."

*Dr. Urquiza's Testimony*

Dr. Urquiza testified regarding several myths and misconceptions about sexual abuse: "There are things like, if a child is abused, they're going to tell right away about what happened to them. If a child is abused, their behavior will be easy to notice. And so we ought to be able to see if a child has been sexually abused just by looking at them. If a child had been abused, then when they tell somebody about that abuse, when they make that disclosure, it is clear, concise, orderly. There is also some misperception that people have with regard to the kinds of relationships that happen between a perpetrator and the victim. That is, we have this whole mythology about 'be wary of strangers' in regard to child abuse or sexual abuse. And though that might be good advice, it doesn't really pertain to sexual abuse because most people are sexually abused by somebody with whom they have some type of relationship, an ongoing relationship, not usually strangers."

On cross-examination, defense counsel engaged in this colloquy with Dr. Urquiza:

"[Defense counsel]: Now, in this case you testified that you never read any of the police reports; correct?

"[Dr. Urquiza]: Correct.

"[Defense counsel]: And you've never interviewed any of the girls in this case?

"[Dr. Urquiza]: I know nothing about—anything about this case other than the name of the defendant.

"[Defense counsel]: And so you have no idea whether or not they were or were not victims of sexual abuse?

10

"[Dr. Urquiza]:  That is correct.  And I would not venture any position as to whether they were or were not abused because that's not my role as an expert witness."

*Jury Instructions*

The court instructed the jury with CALCRIM No. 1193 on the scope of CSAAS testimony:  "You heard testimony from Dr. Anthony Urquiza regarding child sexual abuse.  Dr. Urquiza's testimony about child sexual abuse is not evidence that the defendant committed any of the crimes charged against him.  You may consider this evidence only in deciding whether or not [the victims'] conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of their testimony."

The court also instructed the jury with CALCRIM No. 332 on expert witness testimony generally:  "Witnesses were allowed to testify as experts and to give opinions.  You must consider the opinions, but you are not required to accept them as true or correct.  The meaning and importance of any opinion are for you to decide.  In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally.  In addition, consider the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion.  You must decide whether information on which the expert relied was true and accurate.  You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence.  . . .  If the expert witnesses disagreed with one another, you should weigh each opinion against the others.  You should examine the reasons given for each opinion and the facts or other matters on which each witness relied.  You may also compare the experts' qualifications."

11

The court instructed the jury with CALCRIM No. 303: "During the trial, certain evidence was admitted for a limited purpose and you may consider that evidence only for that purpose and for no other."

*Closing Arguments*

The prosecutor argued to the jury in closing regarding the limitations of Dr. Urquiza's testimony: "Now, we also heard from Dr. Urquiza, who talked about child abuse and the general common myths and misconceptions surrounding it. This is not evidence of the guilt [*sic*]. It just helps you with the frame of mind going in when you're evaluating the credibility of these children. You do get to use it to decide whether [the victims'] conduct was consistent with the victim of a sexual abuse. And you do get to use it when you evaluate their credibility."

Defense counsel discussed Dr. Urquiza's testimony when arguing to the jury about how to "determine credibility:" "[W]e start with the basic premise that child abuse happens a hundred percent, but false allegations happen too. These are both true. They both live in the same world. So [the People] call in an expert, the child sexual abuse accommodation syndrome expert, to get rid of these myths—these myths that people don't understand. But the important thing to understand about Dr. Urquiza and this entire philosophy is that it can't be used to prove that a child was actually molested. It's not diagnostic. . . . It's not for you to say, 'Oh, well, they exhibited some of these signs so they must be victims.' No, that's not what it's here for. It cannot help you determine if someone is credible or not credible."

Defense counsel also downplayed Dr. Urquiza's testimony: "[H]e does provide a really magical solution to a complicated problem that the district attorney has with her case, which is credibility, which is consistency, delayed reporting. Right? All of these things that become issues can now be

12

magically explained away." She added, "Because according to Dr. Urquiza, every criteria that we use to evaluate credibility is now consistent with someone who has been abused. The one thing you just have to keep reminding yourself is that [Dr. Urquiza] only works with people who are confirmed victims of abuse."

A. *Applicable Law*

A trial court's decision to admit evidence is reviewed for an abuse of discretion. (*People v. Brooks* (2017) 3 Cal.5th 1, 43.) There are varying degrees of deference within the abuse of discretion standard depending on the aspect of the court's ruling under review. (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711-712.) A "trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Ibid.*, fns. omitted.)

"No evidence is admissible except relevant evidence." (Evid. Code, § 350.) "Except as otherwise provided . . . , all relevant evidence is admissible." (Evid. Code, § 351.) " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness . . . , having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

"Trial courts may admit CSAAS evidence to disabuse jurors of five commonly held 'myths' or misconceptions about child sexual abuse. [Citation.] While CSAAS evidence is not relevant to prove the alleged sexual abuse occurred, it is well established in California law CSAAS evidence is relevant for the limited purpose of evaluating the credibility of an alleged child victim of sexual abuse." (*People v. Lapenias*, *supra,* 67 Cal.App.5th at pp. 170-171.)

13

"If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [¶] (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing . . . that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates . . . ." (Evid. Code, § 801.)

Evidence Code section 352 provides that the court "in its discretion" may exclude otherwise admissible evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Evidence is not "prejudicial" merely because it is harmful to a criminal defendant's case. (*People v. Megown* (2018) 28 Cal.App.5th 157, 164.) Indeed, essentially all relevant evidence introduced by the prosecution is likely to be harmful to a defendant's case. Evidence only creates "undue prejudice" if the evidence tends to evoke an emotional bias against the defendant, and the evidence has relatively little importance based on the specific issues involved in the particular case. (*Ibid.*) "The weighing process under [Evidence Code] section 352 depends upon the trial court's consideration of the unique facts and issues of each case, rather than upon the mechanical application of automatic rules." (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314-1315.)

B. *Analysis*

As set forth above, courts routinely admit CSAAS testimony into evidence under appropriate circumstances. (*People v. Lapenias, supra,* 67 Cal.App.5th at pp. 170-171.) Here, the prosecutor explained to the court during the in limine hearing what evidence she hoped to elicit from the witnesses and why. The prosecutor's offer of proof demonstrated that Dr. Urquiza's proposed testimony about CSAAS had a tendency in reason to prove or disprove disputed facts that were of consequence. (Evid. Code, § 210.) This topic was sufficiently beyond common experience that [the expert's] opinion would assist the jury. (Evid. Code, § 801, subd. (a).) The CSAAS evidence was relevant, had probative value, and the court did not abuse its discretion in admitting it.

Rodriguez also contends Dr. Urquiza's testimony that most children delay disclosure was based on "numerical data from research done by other experts, [and] constituted hearsay for which no exception applied," depriving him of his constitutional right to confront adverse witnesses.

Dr. Urquiza testified: "This notion about the delayed disclosure is very well established. Do all kids delay in disclosure? Clearly, no. But do most kids? Absolutely. The research is very strong that there's a significant period of time, months or years, from the very first time the child is sexually abused to the very first time they either disclose or try to disclose that sexual abuse. So it is not controversial."

Rodriguez did not object to this testimony on hearsay grounds either in his motion in limine or during Dr. Urquiza's testimony therefore, the claim is forfeited. (*People v. Solomon* (2010) 49 Cal.4th 792, 821 ["A motion in limine can preserve an appellate claim, so long as the party objected to the specific evidence on the specific ground urged on appeal"].)

15

In any event, as to all of Rodriguez's challenges to Dr. Urquiza's testimony, he has not shown a reasonable probability of a different result absent that testimony. "Generally, a court's compliance with the rules of evidence does not violate a defendant's right to due process. [Citation.] Further, reviewing courts have routinely held the admission of CSAAS evidence does not violate due process." (*People v. Lapenias, supra,* 67 Cal.App.5th at p. 174.) "Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson* [(*People v. Watson* (1956) 46 Cal.2d 818)] test: The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error." (*People v. Partida* (2005) 37 Cal.4th 428, 439.)

Even assuming the court erred in admitting Dr. Urquiza's CSAAS testimony, there is no reasonable probability that Rodriguez would have achieved a more favorable result in its absence in light of the weight of the victims' testimony, regarding Rodriguez's lewd contact with them. Moreover, Dr. Urquiza testified he did not know the victims or the facts of this case, and he was not expressing any opinion on whether the children were victims of Rodriguez's lewd acts. Further, the jury was instructed with CALCRIM No. 1193 regarding the limits of CSAAS evidence. The court instructed the jury that it was not required to accept expert testimony as true, and about the limited purpose of certain evidence. Both parties emphasized in closing arguments that Dr. Urquiza's testimony did not provide evidence of Rodriguez's guilt. We also point out that in evaluating the evidence, the jury was able to assess Rodriguez's demeanor and credibility during his testimony. Any error was thus harmless beyond a reasonable doubt even under the more rigorous standard set forth in *Chapman v. California* (1967) 386 U.S. 18, which Rodriquez argues should apply here.

16

Rodriguez contends the prosecutor committed misconduct while discussing the concept of reasonable doubt in closing arguments: "[B]y telling jurors that two versions of events does not equal reasonable doubt, the prosecutor misstated the law on the prosecution's burden of proof. The prosecution still was required to prove appellant's guilt beyond a reasonable doubt whether or not reasonable doubt was based on the conflicting versions."

Rodriguez also contends the prosecutor committed improper vouching. Specifically, he maintains that by arguing to the jury "about the nationally recognized protocols used in this county and that 'here in San Diego County, that's what we do,' the prosecutor gave the impression that she was behind these protocols and could verify that they worked in this case."

Rodriguez acknowledges that his attorney failed to object to either statement by the prosecutor, but alternatively contends that failure by his counsel constituted ineffective assistance.

A. *Background*

Defense counsel argued to the jury in closing that "an abiding conviction means that in two, five, 10 years from now, you will know beyond a reasonable doubt that you made the right decision."

The prosecutor responded in rebuttal: "So first let's talk about beyond a reasonable doubt, what that means. And, actually, you've heard defense counsel give you a lot of explanations about what it is, but, ultimately, you always got to drawback to what the jury instructions state: 'That's proof that leaves you with an abiding conviction that the charge is true. Evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.' That makes sense. This is the standard of proof that is used in every criminal case in San Diego County. . . . Defense

17

counsel brought on about [*sic*] an example about in 10 years, 20 years, in 15 years how you're going to feel.  Now, we're looking at the evidence in this case and how it applies to the law and the standard, and that standard is, it need not eliminate all possible doubt."

The prosecutor continued, "Two different stories doesn't mean there's reasonable doubt.  And that makes sense. . . .  So just because there's two different stories, it doesn't equal reasonable doubt.  In this case, someone is lying.  We know that.  You heard from [the victims].  They all told you what the defendant did to them.  But then you also heard from the defendant, who says it didn't happen.  Someone's lying.  Who has the motive to lie?  Let's talk about that.  Defendant has the motive to lie in this case.  He got caught.  He's the only one facing charges.  He has everything to lose; nothing to lose for lying."

Separately, defense counsel argued to the jury in closing that the children were possibly suggestible:  "It is your obligation to question whether or not these things happened, and not just accept at face value, even though they're children, what they're saying because we know that false allegations happen.  And so what do we do?  We look at the circumstances.  We look at the investigation.  We look at suggestibility in general because, again, suggestibility doesn't mean lying.  We don't have to say they're liars, they have motives to lie.  No.  We have to say that it's possible that they were influenced, that it's possible that we don't know the whole story."

In rebuttal, the prosecutor argued:  "When we're looking at suggestibility, . . . look at the interview questions.  But most importantly, [the defense's] own expert talked about how this suggestibility exists.  No matter what we do, it's how the memory works.  The most we can do is limit it— eliminate or limit those risks.  And how do we do that?  We put protocols in

18

place.  San Diego County just happens to have those protocols.  Not only do they have those protocols, they have the nationally recognized protocols, those national protocols in place to make sure that this suggestibility doesn't occur, not to mention that Dr. Tom Lyon, who's the one who created this phased approach nationally known, worked with [defense] expert, Dr. McAuliff, and they're very familiar with this suggestibility and what to do and how to eliminate the risk.  Here in San Diego County, that's what we do."

B.  *Applicable Law*

The California Supreme Court has stated:  " 'The standards governing review of misconduct claims are settled.  "A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such ' "unfairness as to make the resulting conviction a denial of due process." ' [Citations.]  Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial."  [Citation.]  "In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review." ' "  (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1275.)

"When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.  [Citations.]  In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' "  (*People v. Centeno* (2014) 60 Cal.4th 659, 667.)

19

" ' " '[A] prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.' " ' " (*People v. Hill* (1998) 17 Cal.4th 800, 819.)

C. *Analysis*

Because defense counsel failed to object to the prosecutor's arguments at trial, Rodriguez's prosecutorial misconduct claim is forfeited on appeal. (*People v. Redd* (2010) 48 Cal.4th 691, 734.) Rodriguez does not argue a request for an admonition would have been futile, and we have no basis to conclude the court would not have given an admonition if requested. Moreover, Rodriguez makes no argument here—and made no argument below—that no admonition could have cured the harm caused by the prosecutor's arguments. Rodriguez has not preserved this issue for review.

Rodriguez claims that any forfeiture was the result of ineffective assistance of counsel. In reviewing such claims, we give significant deference to trial counsel's reasonable tactical decisions, and the " 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " (*People v. Lucas* (1995) 12 Cal.4th 415, 437, quoting *Strickland v. Washington* (1984) 466 U.S. 668, 689.) In considering a claim of ineffective assistance of counsel, it is not necessary to determine " 'counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.' " (*In re Fields* (1990) 51 Cal.3d 1063, 1079, quoting *Strickland,* at p. 697.) " 'Surmounting *Strickland's* high bar is never an easy task.' " (*Harrington v. Richter* (2011) 562 U.S. 86, 105.) And it is "particularly difficult" for a defendant to prevail

on direct appeal on a claim of ineffective assistance by trial counsel. (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

The prosecutors' challenged comments related to the trial evidence, were responsive to defense counsel's arguments, and were well within the vigorous argument permitted by California case law. Further, there is no reasonable likelihood the jury misunderstood the prosecutor's comments as reducing the requirement of proof beyond a reasonable doubt. Understood in context, the prosecutor was emphasizing to the jury that although the victims and Rodriguez provided two completely different versions of the incidents, the jury should not conclude that the case could not be resolved; rather, on this record, the weight of the evidence required them to convict Rodriguez.

As to the claim of vouching, the California Supreme Court has explained: " '[S]o long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the "facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief," her comments cannot be characterized as improper vouching.' " (*People v. Bonilla* (2007) 41 Cal.4th 313, 337.) Here, the prosecutor's comments that San Diego County uses nationally recognized protocols to address suggestibility in children was based on evidence in the record provided by J.G.'s forensic interviewer and the defense psychologist, and were made in response to defense counsel's arguments regarding suggestibility.

Generally, courts assume "the jury followed the court's instructions and not the argument of counsel." (*People v. Valdez* (2004) 32 Cal.4th 73, 114, fn. 14.) The instructions in this case included correct instruction on the law of reasonable doubt, and the proposition that the attorneys' statements are not evidence. The jury was further instructed that "if either attorney misstates

21

the evidence or the law, you rely on the evidence that's presented in trial and the law as stated by me." Jurors were further instructed that, "You alone must judge the credibility or the believability of the witnesses." On this record, we conclude defense counsel did not render deficient performance by failing to object to the prosecutor's challenged arguments. "Counsel is not required to proffer futile objections." (*People v. Anderson* (2001) 25 Cal.4th 543, 587.)

### III.  *Sufficiency of the Evidence Claim*

Rodriguez contends there was insufficient evidence to support his convictions for committing lewd acts on J.G. under section 288, subdivision (b)(1) because his "hand on [J.G.'s] hand was not used to overcome resistance. She gave no resistance.  [He] did not restrain her.  He did not make her do anything.  She made no effort to move her hand."

"In determining whether evidence is sufficient to support a verdict, we examine the entire record, viewing the evidence in the light most favorable to the judgment and presuming in support of the verdict the existence of every fact the jury could reasonably deduce from the evidence.  The issue is whether the record so viewed discloses evidence that is reasonable, credible and of solid value such that a rational trier of fact could find the elements of the crime beyond a reasonable doubt." (*People v. Llamas* (1997) 51 Cal.App.4th 1729, 1736.)  " 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890.)  Moreover, unless the testimony is physically impossible or inherently improbable, the testimony of one witness is sufficient to support a conviction.  (*People v. Young* (2005) 34 Cal.4th 1149, 1181; CALCRIM No. 301.)

22

Section 288, subdivision (a) provides:  "[A] person who willfully and lewdly commits any lewd or lascivious act, . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child, is guilty of a felony."  Section 288, subdivision (b)(1) increases the punishment for "[a] person who commits an act described in subdivision (a) by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person[.]"

The "force" required for a conviction under section 288, subdivision (b)(1) must be " 'substantially different from or substantially greater than that necessary to accomplish the lewd act itself.' " (*People v. Soto* (2011) 51 Cal.4th 229, 242.)  "[A]cts of grabbing, holding and restraining that occur in conjunction with the lewd acts themselves" are sufficient to support a finding that the lewd act was committed by means of force.  (*People v. Alvarez* (2009) 178 Cal.App.4th 999, 1005.)  The court instructed the jury accordingly.[3]

"There is no language in section 288 requiring that a lewd or lascivious act be committed against the child's will." (*People v. Soto, supra,* 51 Cal.4th at p. 237.)  "Lack of consent by the child victim is not an element of either lewd act offense defined in section 288.  Nor is willingness by the child a defense to either crime." (*Soto, supra,* at p. 238.)

_____

[3]    The court instructed the jury with CALCRIM No. 1111 regarding the section 288, subdivision (b)(1) counts that the People must prove "the defendant used force, violence, duress, menace or fear of immediate and unlawful bodily injury to the child or someone else" in committing the lewd act.  The instruction defines the "force" used as being "substantially different from or substantially greater than the force needed to accomplish the act itself."

23

As to count nine, J.G.'s trial testimony and her forensic interview showed that once, when she was alone with Rodriguez in his car, he unbuckled his pants, grabbed her hand and placed it on his penis, placed his hand on top of hers, and moved her hand around. This case is virtually indistinguishable from a case where the defendant grabbed his eight-year-old victim's hand, placed it on his own genitals, and rubbed himself with the victim's hand. (*People v. Pitmon* (1985) 170 Cal.App.3d 38, 44, disapproved of on another ground in *People v. Soto, supra,* 51 Cal.4th at p. 248, fn. 12.) On appeal, the defendant in *Pitmon* argued there was insufficient evidence to sustain a finding of force. (*Pitmon,* at p. 47.) The court rejected this contention, holding "[t]here can be little doubt that defendant's manipulation of [the victim's] hand as a tool to rub his genitals was a use of physical force beyond that necessary to accomplish the lewd act. The facts show defendant had hold of [the victim's] hand throughout this act." (*Id.* at p. 48.) Similarly, in this case, Rodriguez's act of grabbing J.G.'s hand and placing it on his penis and manipulating her hand on his penis was sufficient to support the conviction.

As to count 8, J.G. testified that in the computer room, she sat on Rodriguez's lap and after she saw the video of child pornography playing on his computer screen, he grabbed her hand and put it on his penis. The force used in this act likewise sufficed to support the verdict. (Accord, *People v. Babcock* (1993) 14 Cal.App.4th 383, 388 [force element met where the defendant grabbed the victims' hands and made them touch his genital area].)

DISPOSITION

The judgment is affirmed.

O'ROURKE, J.

WE CONCUR:

McCONNELL, P. J.

BUCHANAN, J.